**In the matter of The TYPOCRAFT COMPANY, Debtor.**

**Bankruptcy No. 95–40626–WS.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Feb. 1, 1999.

Kevin M. Ball of Plunkett & Cooney, Bloomfield Hills, Michigan, appeared on behalf of the Chapter 7 Trustee.

Kenneth Schneider of Schneider, Miller & Lim, P.C., Detroit, Michigan, appeared on behalf of the Debtor.

Jay M. Tower of Sotiroff & Abramczyk, P.C., Bingham Farms, Michigan, appeared on behalf of the objectors.

## OPINION GRANTING OBJECTIONS TO TRUSTEE'S FINAL REPORT

WALTER SHAPERO, Bankruptcy Judge.

The matter before the Court arises from objections to the Trustee's final report by labor organizations, individual employees, and various health and welfare, pension, and insurance funds established or maintained pursuant to Collective Bargaining and ancillary agreements between the Debtor and the union(s) representing its employees ("the Objectors") that were in effect at the time of the filing of its Chapter 11 petition. After some period of operating in Chapter 11 the case was converted to a Chapter 7 proceeding. The Trustee liquidated the available assets and eventually issued his final report. From that report, it appears the case is administratively insolvent in that while there may be sufficient funds to pay all of the Chapter 7 administrative expenses, there are not sufficient funds to pay all of the Chapter 11 administrative expenses, particularly if the claims of the Objectors are held to be Chapter 11 administrative expenses. The attorneys for the Debtor, themselves Chapter 11 administrative creditors, dispute the contentions of the Objectors. The Trustee does not take any position in this dispute.

The Debtor filed its Chapter 11 petition on January 20, 1995, and ceased business a week or two prior to the time that the case was converted to a Chapter 7 proceeding by order dated May 3, 1996. For purposes of this decision it is sufficient to characterize the Objectors' claims as those arising under or pursuant to the Collective Bargaining Agreements and agreements incident thereto ("CBA") that were in effect at the time of the Chapter 11 filing.

During the Chapter 11 period the Debtor was operating its business, it never sought to *reject* the CBA or take any of the steps incident to doing same contemplated by § 1113. Nor did the Debtor take any formal steps to *assume* the CBA under Fed. R.Bankr.P. 6006(a); nor did the Objectors take any steps under Fed.R.Bankr.P. 6006(b) to require the Debtor to assume or reject the CBA. Apparently what occurred was simply that the Debtor continued to operate under the CBA in whole or in part while it was operating.

As noted the claims that are sought by Objectors to be classified as Chapter 11 administrative claims relate to obligations of the Debtor under the CBA arising prior to the filing of the Chapter 11 petition. The trustee's final report did not treat them as Chapter 11 administrative claims, but rather as pre-petition claims. Such would normally be pre-petition debts and not Chapter 11 administrative expenses. However, it is the Objector's argument that in legal effect Debtor should be considered to have *assumed* the CBA post-petition, and having done so, in light of the provisions of § 365(b)(1)(A) is required to cure any de-

faults, including pre-petition defaults. The Objectors thus argue that the Debtor failed to cure the defaulted pre-petition obligations, and by that process they became and are to be treated as a Chapter 11 administrative expense.

One view of the situation may be expressed as follows:

(1) When it comes to *rejection* of a CBA, the provisions of § 1113, and specifically § 1113(b), (c) and (d), apply;

(2) When it comes to a need to implement interim changes in a CBA, presumably pending or during the *rejection* process, § 1113(e) applies.

(3) When it comes to the *assumption* of a CBA (as opposed to its rejection) § 365 and Fed.R.Bankr.P. 6006(a) and (b) apply, as they do in reference to all other executory contracts;

(4) Section 365 and Fed.R.Bankr.P. 6006(a) and (b) and 9014 require affirmative actions by way of appropriate motions on the part of an employer/debtor who is a party to a CBA to assume a CBA, or on the part of the other parties to the CBA, to force or require its assumption;

(5) Neither the failure to take steps to reject under § 1113, nor the failure to invoke or follow the provisions of Fed. R.Bankr.P. 6006 in respect to a rejection, produce the result that a CBA is automatically deemed to have been assumed;

(6) The mutual post-petition adherence to a CBA by its parties without anyone taking the indicated statutory or rule required steps to either assume or reject that CBA, gives that CBA, like any other executory contract, the status of an unassumed, unrejected executory contract.

As authority for their contrary position the Objectors rely primarily on *Adventure Resources Inc. v. Holland,* 137 F.3d 786 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 404, 142 L.Ed.2d 328 (1998), *In re Acorn Bldg. Components, Inc.,* 170 B.R. 317 (E.D.Mich.1994) and *In re Unimet Corp.,* 842 F.2d 879 (6th Cir.1988). The *Adventure Re-*

*sources* case did in fact involve pre-petition obligations. That court also relied largely on *In re Roth American Inc.,* 975 F.2d 949 (3d Cir.1992), for the proposition that the Debtor assumed the CBA as a result of the its failure to reject it in accordance with § 1113. In *Roth American* the court indeed noted the union's contention that the debtor had not sought to reject the CBA under § 1113 and therefore the debtor had perforce "assumed the collective bargaining agreement by operation of law." *Roth American,* 975 F.2d at 957. The *Roth American* court then said "[w]e agree with the Union up to this point." But then the court went on to say "[b]ut it simply does not follow, as the Union contends that all claims under unrejected collective bargaining agreements are entitled to first priority." *Id.* The court concluded that the vacation and severance pay claims involved in that case should be given administrative priority only to the extent they were for compensation for services rendered post-petition. *See id.* at 958. That reasoning is interesting but somewhat illogical. A principal point, meaning and result of any post-petition executory contract "assumption" by the Debtor or Trustee is that pre-petition defaults are thus transformed into post-petition administrative claims of some sort and priority. "Assumption" of a CBA would essentially be irrelevant if the statute is construed to limit administrative priority status of claims for services rendered, even under an "assumed" contract, to services rendered or obligations arising post-petition. Such would have that status in any event (and without any assumption) simply by the fact of having been rendered or incurred post-petition. The *Adventure Resources* court did make a very strong point of the fact that § 365 continues to apply to CBAs except where such an application would create unreconcilable conflict with § 1113 and that the essential character of CBAs as executory contracts was left undisturbed by Congress in enacting § 1113. Thus the court stated:

In the absence of a specific direction from the legislative branch we conclude that where such claims emanate from the breach of a collective bargaining agreement, they are to be granted priority in accordance with the law governing the

treatment in bankruptcy of executory contracts in general.

Thus, *where the Chapter 11 debtor has assumed the benefits and obligations of an existing collective bargaining agreement, but does not comply with its statutory duty to cure all defaults then extent any claims arising from the debtor's failure to cure are entitled to first priority as administrative expenses of the bankruptcy estate.*

137 F.3d at 793 (emphasis added).

In this Court's view "assumed" as used in that decision, refers to some process the result of which an "assumption" under the Bankruptcy Code takes place. A careful reading of *Roth American* and *Adventure Resources* upon which it is based, shows quite clearly they are premised on a finding in some way or fashion that the debtor "assumed" the CBA. (This is apart from the language in the *Roth American* case to the effect that whether or not there was an assumption, administrative expense status should be limited to what had been earned or incurred post-petition.) Indeed one cannot derive from the specific language of § 1113, the conclusion that a CBA that is not "rejected" pursuant to the procedure set out in that section is in effect deemed to have been "assumed." With one exception, the language of § 1113 discusses and refers only to a "rejection" of a CBA. That section's title and its operative paragraphs specifically pertain to "Rejection of collective bargaining agreements." It is true that sub-section (a) states that the debtor-in-possession "may *assume* or reject a collective bargaining agreement only in accordance with the provisions of this section." 11 U.S.C. § 1113(a) (emphasis added). However, that sub-section makes no further reference to "assumption" and the entire remaining portion relates only to the process of rejection. Given the language of almost all cases that have dealt with this issue to the effect that § 365 must be held to govern executory contracts including CBAs, except to the extent modified by § 1113, one must necessarily conclude that the process of "assumption" of CBAs continues to be governed by the general provisions of statute and rule under § 365. The only possible role left for § 365, if it continues to be relevant in a CBA situation, relates to assumption.

If one were to adopt that view, the real question thus would be when and under what circumstances, if any, did an "assumption" of the CBA thus take place. Fed.R.Bankr.P. 6006(a) states quite specifically that a proceeding to assume an executory contract is governed by Rule 9014, which in turn requires the filing of a motion, and mandates reasonable notice and opportunity for interested parties to be heard. A noted authority, after observing that Fed.R.Bankr.P. 6006(a), 9014, and 9013 "require filing of a motion to assume" and acknowledging the minority of cases that permit "tacit or informal assumption," states the following:

> However, the majority, and better reasoned view is that, except for assumption or rejection as part of a plan, the trustee can manifest the intention to assume or reject an executory contract or unexpired lease only by formal motion filed in accordance with the requirements of Rules 6006(a), 9014 and 9013, or in a confirmed plan.

10 *Collier on Bankruptcy,* ¶ 6006.01[3], at 6006–5 (15th ed.1998) (citing *South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.),* 94 F.3d 755, 763 (2d Cir.1996), *Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077, 1079 (9th Cir. 1989) and *In re Uly–Pak, Inc.,* 128 B.R. 763, 765 (Bankr.S.D.Ill.1991)). It is agreed in this case that no such proceedings were commenced by either Objectors or the Debtor or any other interested party. All that happened here was that the Debtor continued to operate its business presumably in accordance with the CBA. In fact, that kind of action or activity in and of itself does not even amount to the waiver or estoppel that the distinct minority of cases noted have occasionally relied on to excuse compliance with the clear and mandatory provisions of Rules 6006 and 9014.

The courts in the noted cases have analyzed the legislative history and almost all say that § 1113 is a carve out, or exception to, § 365. As such, the rules of statutory construction would normally require it to be at least literally, and some say, narrowly

construed. Given the importance of the subject and the fact that Congress dealt specifically and extensively with *rejections* of a CBA, it is unlikely that Congress would not have also specifically dealt with *assumptions* of CBAs had it meant to. Rather its failure to do so should be construed as an intent to leave the issue of assumption to be governed by the existing rules and procedures relating to all executory contracts including CBAs, i.e. § 365 and Fed.R.Bankr.P. 6006 and 9014. Labor is often an important, and in some cases the most important, factor and thus the status of any CBA is critical to the success or failure of the operation (and likely the reorganization case itself). Corporate debtors frequently have substantial pre-petition monetary CBA defaults, particularly in relation to health and welfare and pension obligations. Is it unlikely that Congress meant to consign to a legal never-never land or leave to mere legal inference, the equally, if not more, important matter of *assumption* of that CBA (with its consequent required cures of often very costly pre-petition defaults, as well as future obligations). Nor is it likely, given the specific treatment outlined for all other executory contract agreements, that Congress would have left the fate of a CBA to be ambiguous or unaddressed. Furthermore, it is extremely important that interested parties be notified and have an opportunity to appear with regard to whether or not a debtor is going to assume the obligations under a CBA including, as a condition thereof the mandated curing all defaults under that CBA including pre-petition defaults. Allowing assumption by an informal, default method without the affirmative filing of a motion with notice to interested parties, seriously undercuts this procedural safeguard where as noted, the assumption of a CBA has no less importance and has no less ramifications than its rejection. Therefore it is argued, one should not lightly or without clear legislative indication conclude that Congress, having dealt specifically with rejection in a manner that goes far beyond the requirements in respect to other kinds of executory contracts, intended to leave the manner of an assumption subject to far less clarity and procedural safeguards than required for other executory contracts. This Court would agree with the majority position and would reject the minority position that a debtor may tacitly or informally or by default, assume a CBA.

However, the analysis does not end here. Notwithstanding the foregoing, the decisions in *Unimet* and *Acorn Building Components*, it is argued by Objector, are binding on this Court and/or relevant to and dispositive of the issue here, and require a different result, in their favor.

In *Unimet* during the life of a CBA, the debtor's facilities and operations were closed on May 11, 1984 and all employees were then laid off. The debtor sought to negotiate the elimination of health and life insurance benefits for retirees. The negotiations were unsuccessful. Unimet had filed for protection under Chapter 11 on March 8, 1985. It is not clear whether or not the indicated negotiations took place before or after the filing, but at the time of the filing, "Unimet's only remaining obligation under the collective bargaining agreement was the payment of insurance premiums on behalf of the retirees." 842 F.2d at 880. After the filing, Unimet filed a motion to reject the CBA under § 1113. The Bankruptcy and District Courts ruled that § 1113 does *not* apply to retirees (and thus that the insurance premiums involved were not properly characterized as administrative expenses). The Court of Appeals reversed, concluding that § 1113's protections do apply to retirees. The Court then went on to say the following:

> Unimet also argues, as the district court ruled, that the insurance premiums are not properly payable as administrative expenses, and thus it has no duty to pay them. In order for an obligation to be characterized as an administrative expense pursuant to 11 U.S.C. § 503(b), two criteria must be satisfied. First, the consideration supporting the right to payment must have been given to the debtor-in-possession. Second, the consideration must have benefitted the estate. *See, e.g., In re White Motor Corp.,* 831 F.2d 106 (6th Cir.1987); *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984).
>
> Assuming without deciding that insurance premium payments on behalf of retirees

are not properly payable as administrative expenses, our conclusion that 11 U.S.C. § 1113 encompasses retiree benefits leads to the conclusion that qualification as an administrative expense is not necessary for the union to prevail. As discussed above, section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement. Accordingly, we hold that Unimet cannot escape its obligations in this regard merely because the requirements of section 503 arguably have not been satisfied.

*Unimet,* 842 F.2d at 884.

The general reference to "section 1113" in the second last sentence quoted above, is likely a reference to § 1113(f), which states:

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

In *Acorn Bldg. Components, Inc.,* 170 B.R. 317 (E.D.Mich.1994), before the court was a union's motion to compel debtor to pay both pre- and post-petition wages and benefits as required by a CBA, with a priority equivalent to administrative expenses, contending that § 1113(f) "grants to all provisions of a collective bargaining agreement a super-priority equivalent to an administrative expense priority." *Id.* at 318. Acorn had filed its Chapter 11 petition on April 9, 1992 and after its proposed amendments to the CBA were rejected, filed its application to reject the CBA on June 24, 1992, in response to which the union filed the indicated motion. The bankruptcy court approved rejection of the CBA on July 30, 1992 (which was not appealed) and denied the union's motion to compel payment, which was appealed, and was the subject of the District Court's decision reversing the Bankruptcy Court. The District Court opined:

In addition, this Court must reverse that part of the Bankruptcy Court's order which denies Appellant's motion to compel payment of all pre-petition claims as administrative expenses. That court ruled that to allow pre-petition claims to be raised to the level of administrative ex-

penses would violate the holding of *Unimet.* However, the claims *Unimet* dealt with arose, as did many of these, before the petition was filed. To that extent, they were pre-petition obligations. Thus, if *Unimet* does stand for the proposition that claims under a collective bargaining agreement are afforded protection equivalent to administrative expenses, then pre-petition claims must be included.

The language of the *Unimet* Court did not distinguish between claims arising before or after the filing of the Chapter 11 petition. *Unimet* simply states that § 1113(f) requires a debtor-in-possession to comply "with *all* provisions of the collective bargaining agreement *unless and until rejection was permitted by the court."* In re Unimet, 842 F.2d 879, 882 (6th Cir.1988). This interpretation of the statute is supported by § 1113(e) which provides for emergency interim relief from a collective bargaining agreement before rejection is approved.

If compliance with the collective bargaining agreement were not required prior to court approved rejection, an interim relief clause would not be necessary.

The Bankruptcy Court, in ruling that violation of § 1113 must be prioritized according to §§ 503 and 507, following the reasoning of *In re Armstrong Store Fixtures Corp.,* 135 B.R. 18 (Bkrtcy.W.D.Pa.1992). In doing so, the Bankruptcy Court not only misunderstood *Unimet,* but also the more recent *In re Ionosphere,* 922 F.2d 984 (2nd Cir.1990).

and finally concluded:

Ultimately, this Court finds that compelling Appellee Acorn to pay both pre- and post-petition wages and benefits under the agreement at the level of an administrative expense priority is consistent with the plain intent of Congress.

*Acorn Bldg. Components,* 170 B.R. at 320, 321 (footnotes omitted). *See also, In re Ohio Corrugating Company,* No. 4:90CV0810, 1991 WL 213850 (N.D.Ohio Jan. 3, 1991) (same).

In effect *Unimet, Acorn,* and *Ohio Corrugating,* say that § 1113(f) creates its own priority as to covered CBA obligations, whether pre- or post-petition. While *Acorn* may not be binding on this Court (*see In re*

*Gaylor,* 123 B.R. 236, 242 (Bankr.E.D.Mich. 1991)) *Unimet* is, and that court said that qualification as an administrative expense was not necessary for the union to prevail. While this Court might, on the strength of the indicated opposing views, conclude to the contrary, a fair reading of *Unimet* indicates that § 1113(f) in effect precludes the applicability or relevancy of the assumption analysis espoused by cases in other circuits, which interprets the language of § 1113(f) to only preclude unilateral termination or alteration by a trustee (debtor) of the provisions of a CBA until its rejection under § 1113. This reading also means and produces the necessary result that (1) a failure to make payments under that CBA (of pre-petition obligations) is tantamount to an attempt to alter or terminate that CBA and (2) those unpaid pre-petition obligations achieve the status of Chapter 11 administrative expenses.

While this Court believes that this is questionable logic and a result not necessarily called for by the statute and rules in question, the Court also believes that the language of *Unimet* dictates the results sought by Objectors in this case, specifically going as it did beyond what some might say is the narrower "holding" in that case, i.e. that § 1113 applies to retiree benefits.

Objectors shall submit an appropriate order.